**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UMB Bank NA, | No. CV-22-01105-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Harvest Gold Silica Incorporated, et al., | |
| Defendants. | |
| Harvest Gold Silica, Inc., | |
| Counterclaimant, | |
| v. | |
| UMB Bank NA, et al., | |
| Counterdefendants. | |
| Harvest Gold Silica, Inc., | |
| Third-Party Plaintiff, | |
| v. | |
| Greenwich Investment Management, Inc., et al., | |
| Third-Party Defendants. | |

Before the Court is Plaintiff's ("UMB Bank") Supplemental Application for Appointment of Receiver (Doc. 99). Also, before the Court is UMB Bank's Motion to Dismiss Harvest Gold Silica, Inc.'s ("Harvest Gold Silica" or "HGS") First Amended Counterclaims (Doc. 75) and Third-Party Defendants Greenwich Investment Management Inc.'s and L. George Rieger's ("Greenwich Investment Management" and "Rieger") Motion to Dismiss Harvest Gold Silica, Inc.'s Third-Party Complaint (Doc. 94). For the following reasons, Plaintiff's application for appointment of a receiver is granted, UMB Bank's motion to dismiss is granted in part and denied in part and Third-Party Defendants' motion to dismiss is denied.

## BACKGROUND

This action concerns the parties' disputes about their obligations under several agreements regarding the issuance of $22 million in revenue bonds. (Doc. 1 at 2.) The bonds were issued by the Arizona Industrial Development Authority ("AZIDA") pursuant to the Trust Indenture and sold to Greenwich Investment Management Inc. ("GIM"). (*Id.* at 3; Doc. 1-2 at 209.) AZIDA loaned the proceeds from the sale of the bonds to HGS to finance the purchase of the necessary equipment and property and establish an operation that remediates mine solid waste into silica-based products. (*Id.* at 6–7; Doc. 1-4 at 8.) To secure repayment of the bonds HGS obligated itself to: (1) make payments to Plaintiff as Trustee sufficient to service the loan agreement and trust indenture, (2) to remain solvent, and (3) to make sufficient product sales to maintain debt service. (Doc. 1 at 10–11.) Failure to meet these obligations afforded Plaintiff "as a matter of right" the power to appoint a receiver over the mortgaged leasehold property. (*Id*. at 13.)

Thereafter, HGS agreed with Vast Mountain Development, Inc. ("VMD") to operate the leased facilities and HGS assigned all its rights and interests but not its liabilities under the Operating Agreement to the Plaintiff. (*Id.* at 17.) Payments under this agreement have not been made. (*Id.* at 19.) Plaintiff requests the appointment of a receiver over HSG's collateral and brings other counts against HGS and VMD. (*Id.* at 20–29.) Plaintiff asserts Counts II and III against HGS for breach of the promissory note and loan agreement, and

in Counts IV, V and VI seeks a permanent injunction and an accounting from HGS and VMD. (*Id.* at 24–28.) In Count VII Plaintiff seeks to foreclose the interest of potential lienholder Defendants including HGS, VMD and Solid Gold, Inc. (*Id.* at 29.)

In conjunction with its answer, HGS has filed a counterclaim and third-party complaint of five counts against the Plaintiff and Third-Party Defendants Greenwich Investment Management and L. George Rieger alleging that UMB conspired with the Third-Party Defendants to cause HSB to breach its obligations. (Doc. 69.) The Trustee and the Third-Party Defendants' now move to dismiss those counterclaims/third-party claims. (Doc. 75; Doc. 94.)

## DISCUSSION

### I.  Application for Appointment of Receiver

#### A. Legal Standard

"[F]ederal law governs the issue of whether to appoint a receiver in a diversity action." *Can. Life Assurance Co. v. LaPeter*, 563 F.3d 837, 843 (9th Cir. 2009). The appointment of a Receiver is committed to the discretion of the district court. *Id.* at 844. While the Ninth Circuit has articulated several factors that the district court may consider in its discretion, no factor is required or dispositive in the inquiry. *Id.* The relevant factors include: (1) whether the party seeking the appointment has a valid claim; (2) whether there is fraudulent conduct or the probability of fraudulent conduct by the defendant; (3) whether the property is in imminent danger of being lost, concealed, injured, diminished in value, or squandered; (4) whether legal remedies are inadequate; (5) whether the harm to plaintiff by denial of the appointment would outweigh the injury to the party opposing appointment; (6) the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property; and (7) whether the plaintiff's interests sought to be protected will in fact be well-served by the receivership. *Id.* Moreover, "[c]onsent by the parties in a deed of trust is a factor that commands great weight, but it is not dispositive." *Sterling Sav. Bank v. Citadel Dev. Co.*, 656 F. Supp. 2d 1248, 1260 (D. Or. 2009).

### B. Analysis

At the outset, UMB Bank has standing to pursue a collateral receivership over the Mortgaged Leasehold Property. HGS does not appear to dispute that the Deed of Trust encumbered its real and personal property and granted UMB Bank a security interest in the property. Instead, it challenges that no receivership may be granted because UMB Bank does not have legal or equitable rights in VMD's property. (Doc. 105 at 7–16.) Nevertheless, because UMB Bank seeks only a receivership over the collateral, it has standing to pursue such a receivership over HGS's collateral.

#### 1. Consent

HGS expressly consented to a receivership as a remedy upon an Event of Default. (Doc. 99 at 8.) It does not dispute that it consented to a receivership. (Doc. 105 at 8.) And while consent "does not affect the court's need to weigh the *Canada Life* factors," it does "command[] great weight" in the determination. *Sterling Sav. Bank*, 656 F. Supp. 2d at 1260, 1262. HGS agreed in both the Trust Indenture and the Deed of Trust that UMB Bank could obtain appointment of a receiver "as a matter of strict right," if an Event of Default occurred. (Doc. 1-5 at 23–24; Doc. 1-3 at 48.) Moreover, while HGS states that whether an Event of Default occurred prior to the denial of its requested funds is highly contested, it does not appear reasonably disputed that at least one Event of Default has occurred at this juncture. (Doc. 83 at 6–8.) Namely, HGS agrees that it has not paid its obligations for several years and has not provided UMB with the required documentation. (*Id.* at 11, 13, 16–17.) Therefore, the consent factor weighs heavily in favor of appointing a receiver.

#### 2. Validity and Probable Success of Plaintiff's Claims

Plaintiff has demonstrated that it has a valid claim with a likelihood of success. UMB Bank alleges that HGS has breached the Loan Agreement and Promissory Notes in several ways, including: (1) failing to make principal or interest payments for years; (2) not remaining solvent; (3) failing to satisfy the debt service coverage ratio; (4) failing to report sufficient sales; and (5) failing to comply with its reporting requirements. (Doc. 99 at 15–16.) Moreover, according to documents provided by VMD, the net income generated

by the silica sales business on the Mortgaged Leasehold Property was negative $1.4 million. (*Id.* at 15.)

HGS, failing to respond to the bulk of UMB Bank's allegations, insists that it is not in default. (Doc. 105 at 8–9.) For this proposition, it relies on the fact that it brought a counterclaim and has defended against a motion to dismiss. (*Id.*) HGS's response fails to tip this factor in its favor for two reasons.

First, its arguments against default appear largely invalid. HGS relies on the substance of its counterclaims to indicate that it is not in default. The core of those claims is that UMB Bank wrongfully withheld certain disbursements from HGS on the grounds that they were in default when they were, in fact, not in default. (*Id.*) And that argument relies on HGS's theory that notice was required before any Event of Default could occur. (Doc. 83 at 6-8) This argument is contradicted by the plain terms of the Trust Indenture and Loan Agreement. Under those agreements, failure to pay automatically constitutes an Event of Default since the provisions identifying those Events of Default do not state that they require notice. (Doc. 1-3 at 46, § 7.01(a)(i)–(ii).) Failure to perform other covenants or agreements, as expressly distinguished in the Trust Indenture from failures to pay, required notice and an opportunity to cure before an Event of Default occurred. (*Id.* at 46, § 7.01(a)(iii).) Because the plain language of the contract controls, any arguments that failure to pay required notice before UMB Bank could consider them an Event of Default is plainly contradicted by the contract.

Even setting aside the Events of Default for which HGS was not entitled to notice, HGS did receive notice of default from UMB Bank in November 2020, and has apparently taken no steps to cure it. (Doc. 1 at 11–13.) Those defaults concerned (1) failures to adequately pay, (2) failures to provide certain financial reports, and (3) failure to remain solvent. (Doc. 1 at 11–13; Doc. 1-7 at 8-19.) Even if the Court entertained HGS's argument not expressly stated but perhaps underpinning its arguments that any default was caused by HGS's failure to provide disbursements, this only gets them so far. First, HGS's counsel acknowledged at oral argument that HGS has not made a payment in years and has

not ever made a payment that did not come from the bond proceeds themselves. HGS's counsel also acknowledged that it has not provided the requisite reports to UMB Bank. Even if UMB had been obligated to provide the money (which at this stage seems unlikely for the reasons stated above), HGS has not explained why that would cause an inability to make any payment whatsoever or prevent it from providing UMB Bank the required financial reports under the agreements.

Thus, the existence of HGS's counterclaims do not undermine the validity or likelihood of success of UMB's claims. Because UMB's claims concern breaches of the Loan Agreement and Promissory Notes entirely unrelated or at least much broader than HGS's counterclaims, and HGS does not appear to refute the facts pertaining to its solvency, failure to pay, and failure to provide reporting, this factor tips in UMB's favor.

### 3. Fraudulent Conduct

There is no sufficient allegation of fraud to satisfy the fraudulent conduct factor. UMB's allegations that HGS's business projections were unreasonable in light of their ultimate performance, without any additional facts, does not equate to fraud. Moreover, UMB's claims that a defendant and predecessor company to VMD were found to have engaged in securities fraud 16 to 18 years ago has no bearing on whether fraudulent activity is currently occurring. (Doc. 99 at 11–12.) In the absence of any facts that indicate fraudulent activity, this factor favors HGS.

### 4. Possibility of Loss or Harm to Property Interests

Determining the extent to which property interests will be harmed in the absence of a receiver is complicated by HGS's failure to provide any financial reports or accountings. To the extent HGS challenges UMB's lack of concrete evidence pointing to how the value of specific assets is harmed or threatened, this challenge rings somewhat hollow in light of HGS's total lack of reporting. At oral argument, UMB Bank explained that it does not have access to the site and has not received any of the monthly, quarterly, or annual reports that HGS is required to submit under the loan documents. These documents would provide UMB with an accounting of the property onsite and more detailed information about its

loss or depreciation in value. Having denied UMB access to these documents and the site on which the collateral is located, HGS cannot now point a lack of specificity in their application, which would seem to result from the lack of access, to prevail on this factor.

HGS does not appear to dispute that it has only produced $120,000 in income in three years despite receiving over $14 million in bond proceeds. As UMB properly states, then, the value of the estate has already been significantly impaired. HGS alleges that after paying VMD for processed tailings, the finished products will be worth $2,093 per ton and VMD has approximately 1.5 million tons of mine tailings, amounting to over $3 billion value in mine tailings. (Doc. 106 at 4–5.) Whether that value is being realized or not, HGS's failure to pay any obligations on the interest and principal owed on the bonds demonstrates that harm is occurring or has already occurred to the value of the property. If HGS is profiting from its operations, then a complete failure to pay its obligations is wasting the collateral in which UMB has an interest. If HGS is not profiting from its operations, then the actual value of the collateral is far below the alleged value and the value owed by HGS on the bonds, which also threatens the value of the estate. This factor therefore favors the Plaintiff.

As for the adequacy of UMB's legal remedies, UMB contends that legal remedies are insufficient because the value of the Mortgaged Leasehold Property is inadequate to satisfy the debt held by VMD and HGS. (Doc. 99 at 17–18.) HGS responds that UMB's argument fails for lack of specific evidence pointing to the value of the property. (Doc. 105 at 14.) Again, this argument cannot prevail because HGS has withheld any possible manner for UMB to provide a detailed accounting of the value of the property.

### 5. Balancing of Harms and Plaintiff Well-Served by Receiver

As explained above, although Plaintiff is limited in its ability to provide evidence about harms done to the property, at minimum, it has demonstrated a failure to make payments, failure to adhere to reporting requirements, and failure to generate any substantial profits from the operations at the Congress Mine. HGS does not appear to dispute the fact that it has generated only $120,000 in income after borrowing more than

$22 million. Aside from hopeful future deals which may generate more revenue, HGS has not provided any concrete evidence that its future prospects will improve so significantly as to be able to make its payments under the agreements. Thus, a continuation of the status quo would likely diminish the value of the property further, which would significantly harm UMB Bank by foreclosing its ability to "recover any collateral for which it contracted." *See 8th Wonder Pictures, LLC v. Clear Distrib., LLC*, 2021 WL 6882316, at *4 (C.D. Cal. Feb. 4, 2021). This case is distinguishable from cases in which a plaintiff cannot show that defendants are managing the property poorly. *See, e.g.*, *Compass Bank v. Baraka Holdings, LLC*, 2017 WL 10378348, at *6 (C.D. Cal. Oct. 26,2017). The sheer disparity between money received and income, coupled with the lack of any payments and reporting transparency gives rise to at least an inference of poor management.

Moreover, the harm that HGS may suffer if a receiver is appointed is harm for which it contracted with UMB. The proposed receiver has stated he has no intention of liquidating the property, but instead intends to "assess the site, determine the highest and best use for the collateral, stop any waste, and work diligently to identify a plan to maximize the value of the collateral for the benefit of the Bondholders and Trust Estate." (Doc. 107-1 at 223.) Having failed to make any payments to UMB Bank for years, HGS's potential inability to "maintain and grow the operation at the Congress Mine" is a lesser harm than UMB Bank's total lack of payments or reporting from HGS. And, in any event, if a receiver over the collateral can be considered harmful to HGS, it is a harm that HGS expressly bargained for in the contract.

The fact that UMB would be harmed in the absence of a receiver also demonstrates why UMB Bank would be well-served by a receivership. Thus far, UMB has been unable to obtain payments on the bonds and is unable to ascertain whether the collateral is being wasted. Appointing a receiver to oversee the use of the collateral and ensure it is put to the most valuable use will serve UMB's interests.

As to the challenges to Mr. Ballard specifically, he appears well-qualified in the fields of marketing and management based on his resume. Much of his thirty-year career

has been spent in marketing, management, and sales of chemical products. (Doc. 99 at 19; Doc. 99-2 at Ex. E.) HGS does not explain how such a background disqualifies Mr. Ballard from overseeing the collateral at the Congress Mine. Additionally, his residence on the East coast should not inhibit his ability to serve as receiver since he has attested that he will be on-site at the Congress Mine as his presence is needed. And the proposed compensation for Mr. Ballard appears reasonable. UMB's proposed pay for Mr. Ballard amounts to approximately $75,000 a year, and Mr. Ballard would only receive a percentage of revenues if the project produced over $15 million in revenue. This type of revenue would place HGS, VMD, and UMB in a significantly better position than any of the entities have been in since the bond transactions. As such, the compensation appears reasonable, and Mr. Ballard appears qualified to serve as the receiver.

### 6. Duties of the Receiver

The Court will set forth in a separate Order Appointing Receiver, the duties and authorities of the Receiver.

## II.     Motions to Dismiss

### A. Legal Standard

To survive dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must contain more than a "formulaic recitation of the elements of a cause of action"; it must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When analyzing a complaint for failure to state a claim, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *McShannock v. JP Morgan Chase Bank NA*, 976 F.3d 881, 886–87 (9th Cir. 2020). However, legal conclusions couched as factual allegations are not given a presumption of truthfulness. *See Pareta v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). "A district court may dismiss a complaint only if it fails to state 'enough facts to state a claim to relief that is plausible on its face.'" *McShannock*, 976 F.3d at 887 (quoting *Twombly*, 550 U.S. at 570).

### B. Analysis

#### 1. Standing

HGS is a signatory to the Trust Indenture and alleges that it is a party thereto based on the content and its rights, benefits and obligations under the Indenture. (Doc. 1-3.) Alternately it alleges it has standing as either a party to, or a third-party beneficiary of, the Trust Indenture. (Doc. 69 at 23–24.) HGS signed the Trust Indenture. (Doc. 1-3 at Ex. B.) And, it seems to the Court that BMG relies on the obligations imposed on HGS in the Trust Indenture to support its claims for the appointment of a receiver. It would be incongruous to impose the Trust Indenture's obligations on HSG, without affording it the benefits allocated to HSG by the Indenture. BMG's assertion that HGS lacks standing to bring such claims lacks merit.

#### 2. Count I --Breach of Trust Indenture (Against UMB)

While this Court has ruled above that UMB was likely entitled to withhold payments under the Trust Indenture, a determination made on an emergency application for appointment of a receiver is not a final determination on the merits. The determination of merits claims is not appropriate at a motion to dismiss stage. Even if the Court were to consider the Trust Indenture and determined that UMB would have been entitled to withhold the payments if HGS was in default, there are not facts or documents the Court can consider to conclude (while still deferring to the motion to dismiss standard) that HGS was in default at that time, especially in light of its assertions to the contrary. UMB's motion to dismiss Count I of HGS's counterclaim (breach of contract) is therefore denied.

#### 3. Count II Breach of Covenant of Good Faith and Fair Dealing (Against UMB)

"Arizona 'law implies a covenant of good faith and fair dealing in every contract.'" *Bike Fashion Corp. v. Kramer*, 202 Ariz. 420, 423, 46 P.3d 431, 434 (Ariz. Ct. App. 2002) (quoting *Rawlings v. Apodaca*, 151 Ariz. 149, 153, 726 P.2d 565, 569 (1986)). However, "[a] claim for breach of the covenant is not proper . . . when a plaintiff merely alleges

'[b]reach of an express term in a contract.'" *Ireland Miller, Inc. v. Shee Atika Holdings Phx., LLC*, No. CV-10-00354, 2010 WL 2743653, at *2 (D. Ariz. July 12, 2010) (quoting *Aspect Sys., Inc. v. Lam Rsch. Corp.,* 2006 WL 2683642, at *3 (D. Ariz. 2006)) (second alteration in original). It appears from the text of the counterclaim that HGS bases this claim solely on the breach of express terms of the contract. (Doc. 69.) While HGS alleges that it asserts something broader here, it is unclear what conduct it references aside from the withholding of funds pursuant to the September Requisition and June Request. (*Id.* at 34.) To the extent that HGS asserts that it references broader conduct in that it also encompasses UMB's participation in an "unlawful conspiracy," it appears that the object of that alleged conspiracy is the withholding of the funds. Therefore, HSG fails to allege a plausible Breach of Covenant Claim against either UMB or the Third Parties. UMB's motion to dismiss count two of HGS's counterclaim (breach of implied covenant of good faith) is granted with leave to amend within thirty days of this order.

### 4. Count III Tortious Interference with Trust Indenture (GIM and Rieger)

As with the breach of contract claim above, Rieger and GIM argue that they did not act improperly because, in requesting that the September requisition and the June request not be made, they were exercising their own rights under the agreement—that is they were not strangers to the Indenture. (Doc. 94 at 15.) Nevertheless, they were not parties to the Trust Indenture, nor were they listed in that part of the Indenture that identifies Third-Party beneficiaries. (Doc. 1-3 at Ex. B.) To be sure, section 11.02 of the Indenture specifies that the Indenture may give rights to the owners of the bonds. (*Id.* at 68.) And such rights may be sufficient to grant some status to Rieger and GIM as beneficiaries of the contract. But that determination depends upon the weight of facts that have not yet been established, and cannot be considered on a motion to dismiss. Thus, for present purposes, the motion to dismiss the tortious interference with Trust Indenture Claim is denied.

### 5. Count IV--Tortious Interference with Performance of the Loan Agreement and Promissory Notes (Against UMB, GIM, and Rieger)

Whether or not GIM and Rieger were parties to the Indenture, UMB as AZIDA's assignee to the Loan Agreement and Promissory Notes, was a party to that agreement and those notes. "As a general rule, a party cannot be held liable in tort for intentional interference with its own contract." *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund,* 201 Ariz. 474, 493, 38 P.3d 12, 31 n.19 (2002). Therefore, for the reasons stated above, HGS cannot bring a claim for tortious interference with contract against UMB for tortiously interfering with the loan agreement and the promissory notes because it is an assignee of those agreements. UMB's Motion to Dismiss this claim as to it is granted. Rieger and GIM's motion is, at present, denied for the same reasons that Count III is not yet, at least, dismissed. For similar reasons Count V is denied as against Rieger and GIM and granted as to UMB. One cannot conspire to interfere with a contract to which one is a part.

## CONCLUSION

**IT IS ORDERED GRANTING** Plaintiff's Supplemental Application for Appointment of Receiver (Doc. 99). A separate order appointing receiver shall be filed contemporaneously herewith.

**IT IS FURTHER ORDERED GRANTING IN PART AND DENYING IN PART** UMB Bank's Motion to Dismiss Harvest Gold Silica, Inc.'s First Amended Counterclaims (Doc. 75). Counterclaim Count II is dismissed as to Cross-Defendant UMB with leave to amend within thirty days of this order, Counterclaim Counts IV and V are dismissed as to Cross-Defendant UMB.

**IT IS FURTHER ORDERED DENYING** Third-Party Defendants Greenwich Investment Management Inc. and L. George Rieger's Motion to Dismiss Harvest Gold Silica Inc.'s Third-Party Complaint (Doc. 94).

Dated this 16th day of November, 2023.

_____
G. Murray Snow
Chief United States District Judge