**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UMB Bank NA, | No. CV-22-01105-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Harvest Gold Silica Incorporated, et al., | |
| Defendants. | |

Pending before the Court are Defendants Harvest Gold Silica, Inc. ("HGS") and Vast Mountain Development, Inc.'s ("VMD") Motion to Stay Receivership Orders Pending Appeal and Request for Expedited Consideration (Doc. 120); Defendants HGS and VMD's Emergency Motion for Temporary Stay Pending District Court Ruling on Motion to Stay Receivership Orders Pending Appeal (Doc. 121); Receiver Robert Ballard's ("Receiver") Application for Instructions RE: Defendants' Lack of Cooperation and Failure to Provide Access, Records and Information (Doc. 149); VMD, HGS, Solid Gold, Inc. ("SG"), and John Owen's Joint Motion for Clarification (Doc. 189); and Receiver's Application in Further Support of Request for Sanctions Against Defendants (Doc. 202). The Court rules on each motion, in turn, below.

## BACKGROUND

This action concerns the parties' disputes about their obligations under several agreements regarding the issuance of $22 million in revenue bonds. (Doc. 1 at 2). The

Arizona Industrial Development Authority ("AZIDA") issued the bonds pursuant to the Trust Indenture and sold them to Greenwich Investment Management, Inc. ("GIM").  (*Id.* at 3; Doc. 1-2 at 209).  AZIDA loaned the proceeds from the sale of the bonds to HGS to finance the purchase of the necessary equipment and property and to establish an operation that remediates mine solid waste into silica-based products.  (Doc. 1 at 6–7; Doc. 1-4 at 8.)  To secure repayment of the bonds, HGS obligated itself to: (1) make payments to Plaintiff as Trustee sufficient to service the loan agreement and trust indenture, (2) to remain solvent, and (3) to make sufficient product sales to maintain debt service.  (Doc. 1 at 10–11).  Failure to meet these obligations afforded Plaintiff, "as a matter of right," the power to appoint a receiver over the mortgaged leasehold property.  (*Id.* at 13).

Thereafter, HGS agreed with VMD to operate the leased facilities, and HGS assigned all its rights and interests but not its .  (*Id.* at 17).  Payments under this agreement have not been made.  (*Id.* at 19).  Plaintiff requests the appointment of a receiver over HSG's collateral and brings other counts against HGS and VMD.  (*Id.* at 20–29).  Plaintiff asserts Counts II and III against HGS for breach of the promissory note and loan agreement, and in Counts IV, V, and VI seeks a permanent injunction and an accounting from HGS and VMD.  (*Id.* at 24–28).  In Count VII Plaintiff seeks to foreclose the interest of potential lienholder Defendants, including HGS, VMD, and Solid Gold, Inc.  (*Id.* at 29).

Along with its answer, HGS filed a counterclaim and third-party complaint of five counts against the Plaintiff and Third-Party Defendants Greenwich Investment Management and L. George Rieger alleging that UMB conspired with the Third-Party Defendants to cause HSB to breach its obligations.  (Doc. 69).  On November 16, 2023, the Court issued an order granting Plaintiff's Supplemental Application for Appointment of Receiver and issued a separate order appointing a receiver.  (Doc. 114; Doc. 115).  That order entitled the Receiver to "take possession and control of all the real and personal, tangible and intangible property located on or at certain real property located in the County of Yavapai, State of Arizona . . . ."  (Doc. 115 at 2).  The order further entitled Receiver "[t]o take possession and control of all records, correspondence, . . . books and accounts of

the Borrower-Related Defendants [defined by the order as Harvest Gold Silica and/or Vast Mountain Development] which disclose or refer to the assets, Rents and Profits and/or liabilities pertaining to the Mortgaged Leasehold Property, whether in the possession and control of the Borrower-Related Defendants or the agents, servants and employees of the Borrower-Related Defendants. (Doc. 115 at 4).  It further required the Borrower-Defendants and any of its officers, agents, contractors or employees to turn over such records, *id* at 8, and further prohibited the Borrower-Related Defendants from interfering with the Receiver in the performance of his duties under the order, or from doing anything which would impair the preservation of the Mortgage Leased property and its rents and profits. Id. at 7-8.

On November 29, 2023, Defendants filed a Notice of Appeal (Doc. 119) and Motion to Stay Receivership Orders Pending Appeal and Request for Expedited Consideration (Doc. 120) based on their pending appeal.  Defendants also filed an Emergency Motion for Temporary Stay Pending District Court Ruling on Motion to Stay Receivership Orders Pending Appeal (Doc. 121).  On February 7, 2024, Receiver filed an Application for Instructions RE: Defendants' Lack of Cooperation and Failure to Provide Access, Records and Information (Doc. 149).  As of that date, Receiver informed the Court that Defendants were denying access to various buildings and personal property onsite, refusing to provide marketing and sales materials, refusing Receiver's termination of the Operating Agreement, threatening Receiver with legal action for tortious interference, and denying Receiver access to invoices, documents, and business records.  (Doc. 149 at 3–8).  On February 20, 2024, the Court held oral argument at which the Court scheduled a show-cause hearing to be held on March 5, 2024 to determine whether the Defendants were in civil contempt of this Court's orders.  (Doc. 151). The parties filed briefs, as ordered, in preparation for the civil contempt hearing.  On the eve of that hearing, at 4:40 PM on March 4, 2024, Defendants filed a notice indicating HGS and VMD had, only minutes before, filed for Chapter 11 Bankruptcy in two separate bankruptcy courts: the Eastern and Northern Districts of Texas.  (Doc. 158).    At the time HGS and VMD filed their

bankruptcies they still had not provided the Court with VMD bank account information and documents, documentation for invoices and payments between VMD and HGS, and access to the IT infrastructure for order fulfillment, shipping, project management, and financial systems." Ex. 202-4 at 3-4.

At the proceedings the next day in this matter, the Parties were ordered to brief whether the contempt proceedings in this Court were automatically stayed. (Doc. 160). On March 27, however, the Bankruptcy Court in the Eastern District of Texas, in which the VMD bankruptcy was filed, held an evidentiary hearing on the Receiver's Motion for Relief from Stay and to Excuse Turnover. After the March 27 hearing, the Bankruptcy Court continued the Receiver's motions and ordered VMD to disclose to the Receiver the pertinent financial records.[1] Not quite two weeks later, on April 10, the Bankruptcy Court held an additional hearing on the United States Trustee's Motion to Dismiss the VMD bankruptcy to which VMD filed an opposition. The day before the hearing, however, VMD agreed to a dismissal of the bankruptcy with prejudice for one year, but the Receiver objected to the dismissal absent a determination by the Bankruptcy Court that the filing had been made in bad faith. At the scheduled hearing, the Receiver introduced some of VMD's financial records first disclosed by VMD pursuant to the order of the Texas Bankruptcy Court. VMD was represented at the hearing, but Mr. Owen was not present and VMD otherwise chose to introduce no testimony. Based on the evidence and the testimony presented at the March 27 and April 10 hearings, the Bankruptcy Court issued its findings of fact in the VMD bankruptcy on April 25. It determined:

- John Owen was a person in control of both VMD and HGS. (Doc. 173-1 at 1).
- Owen was aware of and directed the bankruptcy filings of both VMD and HGS in different judicial districts in Texas. (*Id.* at 2). And this despite the fact that both bankruptcies could have been filed in the District of Arizona. (*Id.* at 8).
- HGS failed to disclose the VMD bankruptcy as required by law. (*Id.* at 2).

---

[1] Despite Defendants' assertion to the contrary, the Bankruptcy Court required the Defendants to produce the relevant documents *sua sponte.* Doc. 221 Exh. B at 146-47.

- After HGS received the bond proceeds in this case, it provided $14 million of them to VMD purportedly to manage the operations at the Congress Mine. (*Id.* at 3).
- Neither HGS nor VMD has ever made a payment related to the bond obligations.
- John Owen, the only witness for VMD, could not provide "a satisfactory explanation of how the money was earned or disbursed." (*Id.* at 3).
- There have been no operations at the Congress mine since 2021, and VMD has had no income from the Congress Mine in the last three years. (*Id.*)
- Although VMD's Statement of Financial Affairs ("SoFA") reflects 2.3 million in income in 2023 and 2024, Owen could not explain how the money was earned or disbursed. (*Id.*)
- Owen could not identify the location of VMD's gold leaching plant. (*Id.*)
- John Owen's testimony was "vague, incomplete, and evasive" and it appeared as though he "used [VMD's] accounts as his personal piggy bank." (*Id.* at 4).
- "The Receiver was blocked in every effort he made to accomplish his role, including his attempts to review financial records." (*Id.*).
- The Bankruptcy Court ordered VMD to produce financial documents related to the disbursement of the $14 million originally received by VMD from HGS for the April 10 hearing. It further ordered VMD to produce financial documents related to the $2.3 million set out in its SofA.
- Financial documents from the year before the bankruptcy petition indicate "voluminous transfers [] to, or for the benefit of [] insiders." (*Id.* at 5–6). The following transfers were not listed on VMD's Statement of Financial Affairs. (*Id.*)
  - $38,000 to Don Brown/Vail Village. (*Id*).
  - Over $54,000 to Rachel Mathis. (*Id*).
  - Over $400,000 to John Owen. (*Id*).
  - Additional payments of over $775,000 to John Owen's American Express, Chase, and Citicard credit cards. (*Id.*).
  - Over $48,500 to Cardinal Resources, owned by Kevin Jones (*Id.*).

- None of these substantial, routine and systematic transfers were listed on VMD's SofA which is a clear indication of bad faith. (*Id*.).
- During the April 10 hearing evidence was presented that VMD consistently made payments to Mac Health totaling over $126,500. VMD presented no evidence that it was benefited by these payments, nor were these payments on its SofA. (*Id*.)
- The bankruptcy cases were filed "for the purpose of delaying and hindering Vast Mountain's largest creditor and not for the purpose of reorganization." (*Id*. at 7).
- "[The VMD] and HGS bankruptcy cases are related cases which were filed in different districts in an obvious attempt to delay the Receiver and the Bank. (*Id*. at 9).
- "The evidence . . . showed that the [VMD] bank account was not used primarily for operations, but instead as a vehicle to pay insiders." (*Id*.). Owen, in particular, engaged in, and attempted to conceal, gross mismanagement. (*Id*.).

Two days before issuing this order in the VMD bankruptcy, the Bankruptcy Court held a similar hearing in the HGS bankruptcy. HGS and all other parties were represented at the hearing. Mr. Owen testified. (Doc. 218 at 43, 48.) He testified that Harvest Gold filed its bankruptcy because it was in negotiations for funding, and the only way the prospective interested party would fund any amount to Harvest Gold was through a bankruptcy. *Id*. at 41. On April 26, the Bankruptcy Court entered similar findings in the HGS bankruptcy to those it had made in the VMD bankruptcy, and effectively incorporated those findings. It determined that HGS, though an affiliate of VMD, filed its bankruptcy simultaneously but in a different judicial district than the VMD bankruptcy, that HGS failed to disclose the VMD bankruptcy as is required, that "the obvious intent" of both the HGS and the VMD bankruptcies "was to stay the contempt proceeding" filed in this matter. As it had with the VMD bankruptcy, the Bankruptcy Court determined that the HGS bankruptcy was filed in bad faith. The Bankruptcy Court also determined that:

> HGS failed to disclose insider transfers on the original SoFA filed in the HGS Case, which was amended more than six weeks into the case and two

1

2
3

4
5

6
7

8
9

10
11

12
13

14
15

16
17

18
19

20
21

22
23

24
25

26
27

28

business days before the April 23 Hearing.  The Debtor also failed to amend its Schedules to reflect that certain assets are owned not by the Debtor but instead are owned by non-Debtor affiliates, and further failed to disclose important distribution contracts and the terms of existing leases in Schedule G.  The failures to disclose were material.  The sworn Schedules and SoFA filed by HGS were demonstrated to be false.  Despite HGS being on notice that non-disclosure was an issue, HGS delayed amending the SoFA and took no steps to correct the Schedules.

Doc. 173-2 at 3.  On April 24, 2024, Counsel for Defendants moved to withdraw and further requested that the civil contempt hearing scheduled for April 30 be rescheduled. (Doc. 171).  At proceedings held April 30, 2024, the Court granted Counsel's motion and rescheduled the civil contempt hearing for May 30, 2024.  (Doc. 178; Doc. 179).   On May 30, 2024, the Court held the show-cause hearing to determine whether Defendants were in civil contempt and at which evidence was introduced and admitted.  (Doc. 190).  The Court determined that by the time of the contempt hearing, the Defendants had substantially complied with the Court's orders, and thus declined to hold the Defendants in contempt. On June 27, 2024, Receiver filed an Application for Sanctions against Defendants.  (Doc. 202).  The Court scheduled an oral argument/ evidentiary hearing on that motion for October 3.  (Doc. 211).

Although initially both parties indicated at the October 3 hearing that they would present no new testimony but would rely on the testimony admitted at the OSC hearing, Doc. 218 at 7, 27, 52-53, the Defendants in the end did call John Owen to testify.  *Id.* at 38.  Mr. Owen testified that he was the majority owner and directed operations at HGS and that he owned 25 percent of VMD and was the director of its operations.  *Id*. at 40-41.   He stated in his testimony that he testified to the Texas Bankruptcy Court that Harvest Gold Silica had a Letter of Interest exploring the possibility of four million dollars in funding for it, with two million dollars to go to operations, and two million dollars to the bond holders.  He did not provide the Bankruptcy Court with this letter of interest or seek to introduce it at the hearing at which he testified, and further acknowledged that the Bankruptcy Court did not find his testimony in this regard persuasive. He further testified

1   that he directed that the two bankruptcies be simultaneously filed in two different divisions

2   in Texas, Doc. 218 at 49, and that he untruthfully avowed to the bankruptcy courts that

3   there were no affiliate filings in the HGS bankruptcy.  Id.  He further testified that he was

4   not present at the April 10 hearing because he was told there was an agreement between

5   the US Trustee and Vast Mountain to dismiss the bankruptcy.  *Id*. at 51.

6        At the end of the sanctions hearing, the Court authorized Defendants to file a

7   supplemental response to the cases cited by the Receiver for the proposition that individual

8   officers and owners could be held liable for sanctions along with corporate entities, Doc.

9   218 at 27.  The Court further authorized the supplemental memorandum to include the

10   material in the demonstrative document that outlined the timing of the Receiver's requests

11   for information/access and the response by VMD. *Id.* at 34-36, 54-55.   In fact, however,

12   most of the supplemental brief filed by VMD was not related to the two topics authorized

13   by the Court.  Rather, most of the supplemental brief was dedicated to evidence and

14   argument not offered at the scheduled hearing pertaining to the Bankruptcy Court's

15   findings of bad faith.

**DISCUSSION**

16

17   **I.    Defendants' Motion to Stay Pending Appeal**

18        **A. Legal Standard**

19        A court may grant a stay of its own order pending an appeal.  *Sherrill v. Ariz. Health*

20   *Care Cost Containment Sys.*, No. CV-13-00195-TUC-JGZ, 2013 WL 12040008, at *1 (D.

21   Ariz. Oct. 22, 2013) (quoting *Nken v. Holder*, 556 U.S. 418, 432 (2009)).  Courts consider

22   four factors when considering whether to grant a stay:

> (1) whether the stay applicant has made a strong showing that
> he is likely to succeed on the merits; (2) whether the applicant
> will be irreparably injured absent a stay; (3) whether issuance
> of the stay will substantially injure the other parties interested
> in the proceeding; and (4) where the public interest lies.

23

24

25

26

27

28   *Nken*, 556 U.S. at 434.  "The first two factors . . . are the most critical." *Id.*  A mere showing

1    that success on the merits or irreparable injury is possible is not enough.  *Id.* at 434–35.

2    "[A] stay is not a matter of right, even if irreparable injury might result."  *Hilton v.*

3    *Braunskill*, 481 U.S. 770, 76 (1987).  "The party requesting a stay bears the burden of

4    showing that the circumstances justify an exercise of that discretion."  *Id.* at 433–34.

5            **B.  Analysis**

6            Defendants have not carried their burden to justify a stay in this matter.  Importantly,

7    Defendants have not made a strong showing that they are likely to succeed on the merits

8    of their appeal.  Defendants argue that Receiver is stepping beyond the authority granted

9    to him by the Court based on Defendants' interpretation of the phrase "Mortgaged

10   Leasehold Property." Defendant seeks to bring in its own interpretation of that phrase based

11   on contracts between the parties predating the Court's appointment of a receiver.  The

12   Court, however, expressly defined "Mortgage Leasehold Property" in its Order Appointing

13   a Receiver.  (Doc. 115 at 2, 13–14).  Defendants cannot bring in earlier extrinsic definitions

14   to muddy the clear definition provided by the Court.  As such, Defendants have not made

15   a strong showing that they are likely to succeed on the merits of their appeal.

16           The remaining *Nken* factors also do not help Defendants after failing to establish the

17   first factor.  It is unlikely that Defendants will suffer an irreparable injury because they are

18   unlikely to succeed on the merits.  Additionally, because it is likely that Defendants' appeal

19   will ultimately fail, both Plaintiff and Receiver are at risk of injury if the Court's order is

20   stayed.  Finally, because the bonds at issue in this matter are issued with state dollars, the

21   public interest also weighs against staying the receivership.

22           In sum, the *Nken* factors indicate that the receivership should not be stayed.[2]

23

24   **II.    Application for Instructions & Motion for Clarification**

25           On February 7, 2024, Receiver filed an Application for Instructions.  (Doc. 149).

26

27   [2] Because Defendants' Motion to Stay Receivership Orders Pending Appeal and Request
     for Expedited Consideration (Doc. 120) is ruled on in this order, Defendants' Emergency

28   Motion for Temporary Stay Pending District Court Ruling on Motion to Stay Receivership
     Orders Pending Appeal (Doc. 121) is moot.

On May 28, 2024, Defendants filed a Joint Motion for Clarification. (Doc. 189). In neither motion do any of the parties suggest that the Receivership Order would not require the Defendants to disclose the documents relating to what they did with the proceeds of the bonds in this case. The Defendants, however, did not begin to provide these documents until the Bankruptcy Court similarly ordered their disclosure. The orders of this Court—particularly the Order Appointing Receiver—and the content of the many proceedings held before this Court, (*See* Docs. 151, 160, 179, 190), have clarified and answered the questions in the Application for Instructions (Doc. 149) and Motion for Clarification (Doc. 189). Accordingly, these two filings are moot.

## III.    Receiver's Motion for Sanctions

Federal courts have the inherent power to manage their own affairs, including "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991); *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017). As such, courts have authority to order a party acting in bad faith to reimburse another party for legal fees and costs incurred. *Goodyear Tire & Rubber Co.*, 581 U.S. at 107. These sanctions are compensatory, not punitive, in nature. *Id.* at 108. "In other words, the fee award may go no further than to redress the wronged party 'for losses sustained'; it may not impose an additional amount as punishment for the sanctioned party's misbehavior." *Id.* (citing *Mine Workers v. Bagwell*, 512 U.S. 821, 829 (1994)). As such, the party seeking such sanctions must satisfy a but for causation test by showing each requested cost or fee would not have been incurred *but for* the offending party's misconduct. *Id.* at 109–110. With this in mind, district courts still enjoy discretion: "trial courts undertaking that task 'need not, and indeed should not, become green-eyeshade accountants' . . . . The essential goal in shifting fees is 'to do rough justice, not to achieve auditing perfection.'" *Id.* at 109–110.

Courts are not limited to using this power to address misconduct that appears before them. Bad faith conduct occurring outside court, including in other jurisdictions, may be sanctioned by a district court. *Chambers*, 501 U.S. at 57 ("[The party's] attempt to gain

the FCC's permission to build a new transmission tower was in direct contravention of the District Court's orders to maintain the status quo pending the outcome of the litigation and was therefore within the scope of the District Court's sanctioning power.").

## A. Texas Bankruptcy Proceedings

Receiver seeks $204,496.73 for fees, costs, and expenses incurred relating to the Texas bankruptcy proceedings. Defendants challenge Receiver's request for sanctions regarding the Texas bankruptcy proceedings on various grounds.

First, Defendants argue that Receiver cannot be granted any amount because at the show-cause hearing held May 30, 2024, the Court stated that there was "no basis for contempt today." (Doc. 207-1 at 11). A show-cause hearing, however, as part of a civil contempt proceeding, is designed to coerce compliance with the orders of the Court. Merely because the Defendants had complied with the orders of this Court by the time of the delayed show cause hearing does not deprive Plaintiffs of the right to seek the costs they incurred in forcing Defendant's ultimate compliance with the Court's November 2023 Receivership Order. That Defendants had substantially supplied the materials by the time of the much-delayed OSC hearing, appears to be due to the Bankruptcy Court's orders which were entered months after the Receivership Order and which disclosed records of financial transactions both unorthodox and consistent with self-dealing. That, however, only provides additional reasons why the Defendants should pay the fees incurred by the Receiver in the two bad faith bankruptcy filings made by the Defendants. As such, this Court's statement at the show-cause hearing does not prevent Receiver from offering evidence of the Defendant's bad faith either in his moving papers or at the evidentiary hearing.

Defendants also contend that Receiver is not entitled to sanctions because such a request is barred by *res judicata*. Defendant states that because bankruptcy courts may grant sanctions under 11 U.S.C. § 105(a), Receiver lost his ability to move for sanctions resulting from the Texas bankruptcy proceedings because he did not raise the request there. That is not correct. While this Court and the Bankruptcy Court each have authority to order

sanctions against Defendants, they would not be wielding the same authority to do so. The Bankruptcy Court may have been able to award statutory sanctions for abusing the bankruptcy process. By comparison, this Court can impose sanctions based on Defendants' bad faith conduct regarding this Court's orders (i.e. filing a bankruptcy to avoid an order to show cause hearing which would oblige the Defendants to comply with this Court's order requiring that the receiver be granted access to the assets and financial records and information necessary to fulfill his function). The Bankruptcy Court never had authority, inherent or otherwise, to sanction Defendants for such a reason. As such, Receiver could not have requested sanctions for Defendants' alleged misconduct before this Court.

Defendants next argue that this Court cannot grant sanctions arising from the Texas bankruptcy proceedings because their conduct was not in "direct violation" of this Court's order. (Doc. 207 at 9). That is also not correct. This Court's Receivership Order required the borrower-related defendants [defined by the Receivership Order as HSG and VMD] and any of its officers, agents, contractors or employees [Owen] to turn over their financial records relating to the Mortgage Leasehold Property, Doc. 115 at 8, and further prohibited the Borrower-Related Defendants from interfering with the Receiver in the performance of his duty "[t]o take possession and control of all records, correspondence, . . . books and accounts of the Borrower-Related Defendants which disclose or refer to the assets, Rents and Profits and/or liabilities pertaining to the Mortgaged Leasehold Property, whether in the possession and control of the Borrower-Related Defendants or the agents, servants and employees of the Borrower-Related Defendants." (*id.*at 4).

Despite multiple requests, Defendants had failed to provide to the Receiver prior to the bankruptcies the financial information the Receivership Order required them to provide concerning HGS and VMD's operation of the leased facilities. (Doc. 220 at 5 n.4). The Receivership Order, though broad, is quite clear with respect to the obligations of the Defendants thereunder, and the Court has often discussed the scope of the order with the parties. (*See* Doc. 151, 160, 179, 190). Further, the documents, disclosed during the bankruptcy are at least consistent with mismanagement and diversion of the loaned bond

proceeds and the alter ego assertions made by the Receiver. For example, by their own assertion, both HGS and VMD obtained consulting services for the silica operations on the leased property from health care spas and medical institutions. *See. e.g.* Doc. 221 at 6 n.9. This assertion is dubious, as are many of the other expenditures noticed by the Bankruptcy Court and in the sanctions hearing. Certainly Mr. Owen was provided the chance to address these transactions, but he never did so. To the extent that VMD asserts that because it had other operations it was under no obligation to disclose its financial records under the terms of the Receivership Order that pertained to its operation of the Mortgage Leased Property, the argument is fanciful at best.

Further, and at any event, there is no requirement of a "direct violation," prior to the imposition of inherent sanctions. Defendant cites *Chambers* to support such a principle but in so doing they confuse an example with a principal. There, the Court held that a "party may be sanctioned for abuses of process occurring beyond the courtroom, such as disobeying the court's orders." *Chambers*, 501 U.S. at 57. This is undoubtedly true and is the basis for which this Court may sanction Defendants. By filing for bankruptcy in bad faith the night before a long-scheduled show-cause hearing, while continuing to withhold necessary financial information from the Receiver, the Defendants circumvented the Court's Order concerning the timely turnover of documents pertaining to the operation of the subject property. The Order expressly required the Defendants to turn such documents over to the Receiver, and to make no attempt to frustrate him in the exercise of his court-granted prerogatives. (Doc. 115 at 7). By improperly using bankruptcy proceedings as a stalling mechanism, Defendants interfered with Receiver's duties, thus interfering with this Court's order and imposing excess costs on the receiver in its attempt to act in accordance with this Court's orders.[3]

Defendants further challenge the fees sought by Receiver on the grounds that they are excessive. Defendant does not challenge the sufficiency of documentation for such

---

[3] Indeed, the Bankruptcy Court also found as much, stating that "the Vast Mountain and HGS bankruptcy cases are related cases which were filed in different districts in an attempt to hinder and delay the Receiver and the Bank." (Doc. 13-2 at 4).

1    fees, as is normally required, but rather argues that corporate restructuring will be necessary
2    in any event for the Receiver to have the necessary infusion of funds to make the operation
3    successful.    Defendants thus assert that the bankruptcy was an advisable course to
4    rehabilitate any operations on the leased property.    Nevertheless, as it pertains to the
5    successful operation of the Mortgaged Leased Property, such determinations belong to the
6    Receiver, and not to HGS, VMD and/or Mr. Oweny.

7        In their supplemental brief, Defendants assert that John Owen was not in attendance
8    at the April 10 Bankruptcy Court hearing.    That is immaterial.    Defendants do not argue
9    that the hearing was improper or improperly noticed.    Both Defendants VMD and HGS
10   were represented at the April 10 hearing, and they do not argue to the contrary.    Defendants
11   do not argue that they attempted to put on evidence during the April 10 hearing or that they
12   attempted to have the hearing reset.    In its order dismissing the case, the Bankruptcy Court
13   expressly noted that Defendants chose to put on no evidence at the April 10 hearing.
14   Further, John Owen was present and did testify at the March 27 hearing, and subsequently
15   before the same bankruptcy judge in the HGS bankruptcy on April 23.    And, according to
16   the order dismissing the VMD and HSG bankruptcies, the dismissals were based, at least
17   in part, on that March 27 as well as the April 23 testimony of John Owen.    That Defendants
18   chose to put on no evidence at the April 10 hearing is their choice, but it provides no reason
19   for this Court to disregard the findings of the Bankruptcy Court, especially when they
20   appear to this Court to be well-founded, and at least clear and convincing.[4]

21        Receiver has made the requisite showings and is entitled to sanctions.    Defendants'
22   bankruptcy filings were made in bad faith as a tactic to avoid the contempt proceedings
23   pending before this Court.    (Doc. 173-1 at 9–11; Doc. 173-2 at 3–4).    As such, the fees and

---

24
25   [4] Defendants used their supplemental brief to make a number of arguments that were not
     authorized by the Court.    One of them was that the Bankruptcy Court did not clearly employ
26   a "clear and convincing" standard in determining that the bankruptcy filings were in bad
     faith.    It is not clear that such a standard is required, but the Court need not determine that
27   question, because the evidence detailed by the Bankruptcy Court in its orders, as well as
     supplied by the Receiver in these sanction proceedings, meets the "clear and convincing"
28   standard if necessary.

expenses from the Texas bankruptcy proceedings would not have been incurred by Receiver but for Defendants' bad faith conduct relating to tactical delay of this Court's proceedings.  Having properly and sufficiently documented costs and expenses, Receiver is entitled to reimbursement of this $204,496.73  Receiver has also established travel costs for participating in those proceedings amounting to $2,811.22, adding up to a total of $207,307.95.

### Other Requested Sanctions

Receiver seeks an additional $69,359.82 in fees, costs, and expenses incurred in its attempt to obtain required access to necessary information under the Receivership.  (Doc. 202 at 2). To be sure, a few of the Receiver's requested categories of access or information—such as access to the Defendant's mail boxes and computers—were overbroad, but access to VMD's operational finances related to the Mortgage Leased Property do not fall into that category and were not provided by the Defendants until the Bankruptcy Court ordered them to do so.  Thus, of the amounts sought, the Court declines to award any amount of the initial $10,465 incurred in requests for information.  This is because some initial expense could be expected to be incurred even with cooperative defendants, and a few of the categories of information sought by the Receiver were not within the realm of the Receivership Order and were appropriately resisted by Defendants.

Of the remaining amounts, the Court awards the amounts sought by the Receiver for its preparation of the Application for Instructions ($3,220) the briefing in conjunction with the order to show cause ($6,842) and one half of the amount spent in preparation for the various hearings on the order to show cause ($18,112.50).  The amount sought for preparation for the order to Show cause hearings is reduced, because after the bankruptcy dismissals, there were few if any documents that hadn't already been provided to the Receiver through the bankruptcy proceedings.  Nevertheless, the pendency of the order to show cause proceedings induced Defendants to file the bankruptcies as a delaying tactic which itself resulted in production of the materials, to which the Receiver was entitled by

the Receivership orders.  Given the timing of the filing of the bad faith bankruptcies, some amount of preparation was inevitable for those OSC hearings before they were unexpectedly postponed. The Court further awards the amount sought in briefing the application for sanctions ($5,750) for a total of $33,924.50.  When coupled with the amounts incurred because of the bad faith bankruptcies, this amount totals $241,232.45

### B.        Joint and Several Liability

Receiver requests Defendants—including John Owen—be held jointly and severally liable for any sanctions granted by the Court.  There are four defendants in this matter: HGS, VMD, SG, and John Owen.  Having directly caused the Texas bankruptcy proceedings in tandem, and apparently having intermingled finances and joint direction and mismanagement, it is appropriate to hold HGS and VMD jointly and severally liable together with John Owen.  SG, however, did not participate in these proceedings whatsoever.  As such, holding it liable would be inappropriate as the Receiver has not shown what conduct, if any, of SG's contributed to the bad faith bankruptcy proceedings.

Defendants' argument that John Owen was not a party to the bankruptcies misses the point.  Various papers submitted by the parties, as well as admissions by John Owen in court, establish that John Owen enjoys a position over control of Defendants HGS and VMD, and apparently comingles their finances.  As the Bankruptcy Court concluded "Owen used [VMD] as his personal piggy bank." (Doc. 173-1 at 5). The Bankruptcy Court pointed to various "substantial, routine and systematic" transfers made by VMD to various insiders, including over $400,000 to John Owen personally and over $775,000 to pay John Owen's personal credit cards.  (*Id.* at 6–7).  Indeed, Defendants' own papers indicate that John Owen himself, who had control over VMD and HGS, developed a plan for bankruptcy reorganization, squarely implicating John Owen in the bad faith bankruptcies.  (Doc. 207 at 13). *Wilson v. United States,* 221 U.S. 361, 376 (1911) (holding that "[a] command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs.  If they, apprised of the writ directed to the corporation, prevent

compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience and may be punished."), *National Labor Relations Board v. Trans Ocean Export Packing, Inc.,* 473 F.2d 612, 617 (9th Cir.) (holding in affirming contempt finding against corporate officer that "[t]he corporate officer] has at all material times exercised dominant control over the management of the Company's affairs and was, and is, responsible for the failure to comply with the above-quoted . . ..provision of our judgment.")  *See also Federal Trade Comm'n. v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009)  (Corporate officers engaged in wrongdoing are not shielded from liability by the corporate form.)

In sum, John Owen apparently used at least VMD's funds for personal purposes, he mismanaged both corporations, he directed their simultaneous bankruptcy filings in different jurisdiction outside of Texas and he co-mingled their finances.  As such, VMD, HGS, and John Owen are jointly and severally liable for the sanctions granted in this matter.

## CONCLUSION

Accordingly,

**IT IS THEREFORE ORDERED** Defendants HGS and VMD's Motion to Stay Receivership Orders Pending Appeal and Request for Expedited Consideration (Doc. 120) is **DENIED**.

**IT IS FURTHER ORDERED** directing the Clerk of Court to term Defendants HGS and VMD's Emergency Motion for Temporary Stay Pending District Court Ruling on Motion to Stay Receivership Orders Pending Appeal (Doc. 121) as **MOOT**.

**IT IS FURTHER ORDERED** directing the Clerk of Court to terminate Receiver's Application for Instructions RE: Defendants' Lack of Cooperation and Failure to Provide Access, Records and Information (Doc. 149) as **MOOT**.

**IT IS FURTHER ORDERED** directing the Clerk of Court to term Defendants' Joint Motion for Clarification (Doc. 189) as **MOOT**.

**IT IS FINALLY ORDERED** Receiver's Application in Further Support of

Request for Sanctions Against Defendants (Doc. 202) is **GRANTED** against Defendants VMD, HGS and John Owen.  Defendants VMD, HGS, and John Owen are jointly and severally liable for $241,232.45 in fees, costs, and expenses. The Application is **DENIED** in all other respects.

Dated this 3rd day of December, 2024.

G. Murray Snow
Senior United States District Judge